In re the MARRIAGE OF Christopher C. OAKLEY and Melissa D. Oakley.

Christopher C. Oakley, Petitioner–Appellant,

v.

Melissa D. Oakley, Respondent–Respondent.

No. SD 30691.

Missouri Court of Appeals, Southern District, Division One.

April 27, 2011.

John R. Lightner and J. Matthew Miller, Baird, Lightner, Millsap & Harpool, P.C., Springfield, MO, for Appellant.

Todd F. Thorn, West Plains, MO, for Respondent.

Raymond E. Williams, Williams Law Offices, L.L.C., West Plains, MO, Guardian Ad Litem for Christopher C. Oakley.

GARY W. LYNCH, Judge.

Christopher C. Oakley ("Husband"), through his legal guardian and father, Lester Oakley ("Father"), appeals the Circuit Court of Howell County's denial of his petition for annulment of marriage.[1] Father contends, first, that the trial court plainly erred in denying the petition because Husband had been declared incapacitated in the State of Florida and was therefore legally unable to consent to marry under the Florida judgment and, second, that the trial court's judgment was against the weight of the evidence. Finding no error as alleged, we affirm.

### Factual and Procedural Background

█ "[T]his Court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the judgment and disregard all evidence and inferences to the contrary." *Blair v. Blair,* 147 S.W.3d 882, 885 (Mo.App.2004). Taken in that context, the following evidence was adduced at trial.

In 1986, Husband—a child at the time—was hit by a truck and suffered a traumatic brain injury. Father was first appointed Husband's plenary guardian in Florida in 1988. Father alleged that in 1995, he was appointed Husband's legal guardian in Florida, pursuant to a petition for determination of incapacity. A third party, Donald E. Brown, was named Husband's conservator. Brown is responsible for managing Husband's settlement funds from the truck accident, paying Husband's bills, and giving Husband an allowance. Father and Husband moved to Missouri in 1989, but Father was not issued letters of guardianship in Missouri until October 2009.

Husband resides at Lamplighter Village ("Lamplighter"), an assisted-living facility in Howell County, Missouri. Husband actually lives in a Lamplighter-owned residence that is located across the street from its main facility. Lamplighter is responsible for ensuring that Husband is bathed, has clean clothes, has adequate nutrition, and takes any prescribed medication. Husband receives an allowance and does not pay his own bills.

Sometime before 1997, Husband became involved with another Lamplighter resident, Melissa D. Warren, now Melissa D. Oakley ("Wife"). Husband and Wife live together in the independent residence across from Lamplighter. Wife has a limited guardian and conservator in Charm Eagleman, the Howell County Public Administrator. Thus, Wife also does not pay her own bills or manage her own money.

Husband and Wife approached each guardian seeking permission to marry. Both Father and Eagleman declined to grant permission. After deciding that they "wanted to get married like everybody else[,]" Husband and Wife had a friend drive them to Salem, Arkansas, where they obtained a marriage license on October 5, 2006. They then drove back to Missouri and returned to Salem the following day and got married. Upon returning to Missouri after their marriage, Husband and Wife continued to live together at the Lamplighter residence and held themselves out as a married couple.

---

1. Because multiple guardians are involved in this case and multiple actors share the same last name of Oakley, our reference in this opinion to Lester Oakley as "Father" is solely in his capacity as Husband's legal guardian and in no other capacity.

Although Father knew about the marriage within two or three months after it occurred, he waited nearly two years before filing the underlying action for annulment. He did so after consulting with Husband's conservator and their discussion that the marriage might be considered valid. In his petition, Father claimed that the Florida guardianship papers expressly removed from Husband the right to marry without court approval, and therefore the marriage was void. A photocopy of the Florida guardianship orders was attached to the petition.[2]

Trial was held February 9, 2010. Father presented the testimony of Dr. Dale Halfaker, a psychologist who examined Husband on two occasions, first on November 26, 2002, and again on August 26, 2008. Dr. Halfaker initially met with Husband to tour Lamplighter and make sure Husband's needs were being addressed there. At that time, Dr. Halfaker determined Husband's IQ to be 71, which is just above the level of mild retardation but below the average range. He stated that Husband's "capacity to think, reason, problem-solve, use language to draw conclusions and that sort of thing was significantly diminished." During his second examination of Husband, undertaken to ensure that Husband's needs were still being met at Lamplighter, Dr. Halfaker determined Husband's IQ to be 70 and "basically unchanged"; he felt Husband's answers to objective test questions were "[a] little bit better[.]" Dr. Halfaker acknowledged, however, that simply having an IQ in the borderline range does not disqualify an individual from entering into a marriage. After opining that he feels he has the capacity to judge whether Husband "could under-stand the total ramifications of being married[,]" Dr. Halfaker stated,

I think [Husband] understands marriage in a general sense of that it's a relationship and that you perhaps live with someone, you spend time together, you perhaps have meals together, sleep together and that sort of thing. My concern would be that he does not or would not have the full capacity to take into account all of the legal, financial and just practical ramifications for what a marriage might be. Things like issues of taxes or inheritance or health insurance, those kinds of pieces.

Dr. Halfaker never asked Husband any questions pertaining to his marriage and believes that, although they may not fully comprehend all of the legal and financial consequences of marriage, Husband and Wife appear to have a happy and successful "marriage kind of thing." Dr. Halfaker never had any communication with Wife regarding Husband, and admitted that he would have asked Husband different, more specific questions if he had evaluated him with the specific purpose of determining Husband's capacity to marry. He also admitted that there could be significant emotional consequences for Husband if the marriage was suddenly declared void.

Father, who resides in Eminence, Missouri, testified that he has no objection to Husband and Wife living together, but he does not believe they should be married, primarily because of potential difficulty in moving Husband if Father should relocate from the area. Father also does not believe that Husband understands "the full scenario[,]" asking, "What happens if he decides ten years from now that if somebody else—another girl comes in his life and it's better and bigger and everything than

---

2. Father's motion to supplement the legal file with a copy of his petition with exhibits at-tached as filed in the trial court is sustained.

what he had[?]" Father expressly denied his permission as guardian when Husband and Wife sought his approval to get married, stating, "Why would you buy the cow when you get the milk for free[?]"

Eagleman, Wife's limited guardian and conservator, testified that she, too, denied the couple permission to marry. Eagleman has observed Husband and Wife's relationship on many occasions, stating that they live together as husband and wife and behave as a married couple, doing such activities as going grocery shopping and taking walks; they share the household responsibilities, and do a "pretty good job" of taking care of themselves. Although she did not grant her permission for them to marry, Eagleman did sit down with Husband and Wife to discuss the emotional and financial meaning of getting married, and she believes they both understood the conversation. In her opinion, Husband and Wife made a conscious decision to marry in spite of her admonitions regarding the possible negative financial consequences. In her testimony, Eagleman emphasized that neither Husband nor Wife deal with financial issues on a daily basis because both have conservators. She requested that the trial court uphold the marriage as valid, and stated her intent to seek court approval to allow Husband and Wife to marry if the trial court did annul the marriage.

Husband testified that he "want[s] to stay married[,] ... [b]ecause [he] love[s Wife] and, hopefully, she feels the same about [him]." He further stated that when he married Wife, he wanted to take care of her, and he still wants to take care of her to the best of his ability. Wife testified that she is happier being married to Husband and that she is committed to taking care of Husband. She stated that she and Husband "want to grow old together[,]"

and that both would do whatever they could to take care of the other.

The trial court entered its judgment on March 9, 2010, finding that Father had not met his burden of demonstrating that Husband was not legally able to consent to marry. The trial court stated that it "accepted some of the testimony of each witness as credible and rejected other parts of the testimony of each witness as not credible." The trial court applied Arkansas law in reaching its decision.

Father filed a motion for new trial on April 8, 2010. In that motion, Father asserted that new evidence had come to light since the date of trial and stated that affidavits regarding such evidence would be supplemented at a later date. Father filed an amended motion for new trial on May 3, 2010, in which he again asserted that new evidence had come to light; this time, however, an affidavit was attached in which Father averred that the Florida order of guardianship prohibited Husband from marrying. Also attached to the amended motion was a copy of both Florida orders of guardianship. The trial court denied the motion. This appeal timely followed.

### Discussion

Father presents two points for our review. We review them in the order presented.

### Florida Order of Guardianship not Properly before the Trial Court

■ In his first point, Father contends:

The trial court erred in denying the Petition for Annulment and declaring the marriage of [Husband] and [Wife] to be valid because the court's denial of the Petition for Annulment and declaration of the validity of the marriage were plain error in that the marriage was void; [Husband] had, prior to the mar-

riage, been declared incapacitated and unable to enter into contracts or to marry under the guardianship entered in the State of Florida; no court approval was obtained prior to the marriage; and the Florida guardianship is granted full faith and credit in Missouri.

Because the Florida order of guardianship was not properly before the trial court, Father's first point is denied.

■■■ In accordance with *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976), we will uphold a trial court's judgment unless there is no evidence to support it, the judgment is against the weight of the evidence, or the trial court erroneously declares or applies the law. *Id.* at 32. In examining the trial court's judgment, we view all evidence and reasonable inferences that can be drawn therefrom in the light most favorable to the judgment and disregard all evidences and inferences to the contrary. *Blair,* 147 S.W.3d at 885. Furthermore, the trial court is free to believe or disbelieve all, part, or none of the testimony of any witness. *Nelson v. Nelson,* 25 S.W.3d 511, 518 (Mo.App.2000). Finally, so long as there is credible evidence supporting the conclusions of the trial court, we may not substitute our own judgment for that of the trial court. *Id.*

■■■ As required by federal law, Missouri affords judgments entered in other states full faith and credit. 28 U.S.C.A. § 1738; Section 490.130.[3] However, "[i]n order to be given full faith and credit in a Missouri court, a foreign judgment must be authenticated." *Food Servs. Corp. v. Rheam,* 145 S.W.3d 484, 489 (Mo.App. 2004). Properly authenticated and attested records of judicial proceedings in another state are those that are: (1) attested by the clerk of that court; (2) affixed with the seal of that court, if such a seal exists; and (3) certified by the judge of that court. 28 U.S.C.A. § 1738; Section 490.130. This "certification by a sister-state judge is considered essential to ensure the Missouri court that the prior judgment is valid." *Food Servs. Corp.,* 145 S.W.3d at 489. No such records were before the trial court in this case.

Although mentioned in his original petition and attached thereto, no copy of the Florida order of guardianship was ever admitted at trial, properly authenticated or otherwise; Father admitted as much during oral argument. More importantly, however, the copy of the Florida order of guardianship attached to the amended motion for new trial was not properly certified by the judge of that court and, as such, was not properly authenticated pursuant to 28 U.S.C.A. § 1738 and section 490.130. Thus, ignoring *arguendo* both the questionable timeliness of the amended motion for new trial and the apparent failure to present actual new evidence in that motion, there was simply no foreign judgment before the trial court to which it could afford full faith and credit.[4] It is,

3. All references to 28 U.S.C.A. § 1738 are to U.S.C.A. (1948); all other statutory references are to RSMo 2000, unless otherwise indicated.

4. Although the original motion for new trial was timely filed exactly thirty days following entry of the trial court's judgment, the amended motion for new trial was filed some twenty-five days later, apparently without any request for an extension of time.

Motions for new trial based on newly discovered evidence "must be supported by evidence that only recently came into movant's knowledge and which due diligence would not have uncovered ... sooner." *M.E.S. v. Daughters of Charity Servs. of St. Louis,* 975 S.W.2d 477, 482 (Mo.App.1998). Father's "new evidence" in this case was the Florida order of guardianship. Not only should due diligence have uncovered the Florida judgment, but Father mentioned the Florida order of guardianship in his petition for annulment,

therefore, no surprise that "the [trial] court did not address in its judgment the fact that, as a matter of law, [Husband] is ... legally incapable of marrying."

Father asks this Court to conduct a plain error review of his claim pursuant to Rule 78.08, arguing that, regardless of any timeliness issues and his failure to present the Florida order of guardianship during trial, Husband was still legally unable to consent to marry and any ruling otherwise constitutes a manifest injustice or miscarriage of justice.[5] Father's argument, however, necessarily relies on the validity of the Florida judgment. As Father still has not submitted a properly authenticated document for this Court—or any court—to review, there is, for all intents and purposes, no Florida judgment.

■ At oral argument, Father raised—for the first time—the argument that Wife's admissions to paragraphs 8, 9, 10, 11, and 12 in her "Answer to Petitioner's Petition for Annulment" relieved him of both the duty to properly authenticate the Florida order of guardianship and the burden of introducing evidence regarding that Florida order of guardianship during trial. Father relies on the proposition that such admissions created uncontroverted statements of fact demonstrating that the Florida order of guardianship was in effect at the time of the marriage and prohibited Husband from marrying without court approval, and that the trial court therefore erred in upholding the marriage. We disagree.

Setting aside the untimeliness of Father's introduction of this argument,[6] Father's argument fails in two respects. First, while Father notes Wife's admissions of paragraphs 8, 9, 10, 11, and 12, he ignores Wife's denial of paragraph 13. Wife's five noted admissions effectively acknowledge that, on the dates mentioned, a court in Florida entered judgments declaring Father Husband's guardian and Florida law permits the removal of one's right to marry in such a situation. In paragraph 13, however, Wife denies Petitioner's statement that "[a]ccordingly, pursuant to the Order on Amended and Restated Petition for Determination of Incapacity and Florida Law, [Husband] is incapable of getting married without Court approval." Such a denial contests the continued validity of the Florida judgment in question, and there was, therefore, no uncontroverted statement of fact before the trial court demonstrating that Husband was deprived of his right to marry.

■ Second, Father's argument ignores the necessity of strict compliance with the authentication requirement in recognition of foreign judgments. Before Missouri's enactment of the Uniform Enforcement of Foreign Judgments Act in 1951, see 1951 Mo. Laws 358, in order to execute a judgment issued in another state, the party seeking such execution was required to bring a new action in Missouri, as the full-faith-and-credit clause of the federal Constitution, U.S. Const. art. IV, § 1, merely allowed the bringing and maintenance of

thereby expressly demonstrating his prior knowledge of the order. Father admits as much in his brief. Therefore, even if Father had submitted a properly authenticated and attested copy of the judgment at issue with his amended motion for new trial, the judgment does not constitute newly discovered evidence.

5. All references to rules are to Missouri Court Rules (2010).

6. See *Geneser v. State Farm Mut. Auto. Ins. Co.,* 787 S.W.2d 288, 289 n. 1 (Mo.App.1989) (finding that matters raised for the first time at oral argument and not presented to the trial court will not be reviewed).

actions based on "extrastate judgments." *McMinn v. McMinn*, 884 S.W.2d 277, 279 (Mo.App.1994). The Uniform Enforcement of Foreign Judgments Act was enacted "to substitute a statutory procedure for the common law right to sue on the judgment where a plaintiff was seeking enforcement of a judgment in another state." *Id.* It was further intended "to facilitate the enforcement of foreign judgments by providing a quick and convenient procedure for registration of foreign judgments in sister states." *Id.* at 280. The act thus greatly simplified the procedure for registration of a foreign judgment in Missouri by requiring the party seeking to register the foreign judgment to file a verified petition and an authenticated copy of the judgment at issue. *Id.* at 279–80. *See also* section 511.760, RSMo 1959.

Moreover, the process was further simplified by the amendment of Rule 74.14 in 1988, which eliminated the need to file a verified petition. *McMinn*, 884 S.W.2d at 280. "Consequently, the *only substantive requirement left* under Rule 74.14 is authentication." *Id.* "This makes the authentication requirement even more important." *Id.* Rule 74.14 "has eliminated all other safeguards preventing invalid or otherwise improper judgments from being enforced. The additional step of requiring the sister state judge's certification is essential to assure the Missouri court that the prior judgment is valid." *Id.* This is particularly important when, in a case such as this, an individual's fundamental right is at stake. *See Zablocki v. Redhail*, 434 U.S. 374, 384, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (holding that the right to marry is "one of the 'basic civil rights of man,' fundamental to our very existence and survival"); *Komosa v. Komosa*, 939 S.W.2d 479, 483 (Mo.App.1997) (acknowledging the right to marry is a fundamental right). Father did not introduce a properly authenticated copy of the Florida order of guardianship, and no purported admission satisfied that requirement. As such, Father's first point is denied.

### *Judgment is not against the Weight of the Evidence*

■ In his second point Father claims:

The trial court erred in finding that [Father] had not met his burden of rebutting the presumption of a valid marriage between [Husband] and [Wife] because the weight of the evidence supported a finding that the marriage was invalid in that [Husband] was incapacitated at the time he became married to [Wife]; [Husband] had sustained a severe closed head injury as a result of an automobile accident and suffered significant neurological damage including reduced I.Q., difficulty with memory, problem solving, money management; [Husband] was and is unable to understand the legal and financial concepts of marriage; and he was previously declared incapacitated and incapable of entering into contracts and marrying.

We disagree.

■ This Court reviews judgments in annulment cases under the standard articulated in *Murphy*, 536 S.W.2d at 32: "[T]he decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Blair*, 147 S.W.3d at 884–85. We defer "to the trial court's credibility determinations, recognizing that the [trial] court is free to believe all, part, or none of the testimony presented.... The trial court's determinations are entitled to deference even if some of the evidence supports a different conclusion."

*Hance v. Altom,* 326 S.W.3d 133, 135–36 (Mo.App.2010) (internal citation omitted). Although examination of the weight of the evidence necessarily involves some consideration of evidence contrary to the judgment at issue, we nevertheless defer to the trial court as the finder of fact. *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht,* 25 S.W.3d 530, 536 (Mo.App.2000). Finally, "[a]ppellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy,* 536 S.W.2d at 32.

 "Weight of the evidence refers to weight in probative value, not quantity or the amount of evidence. The weight of evidence is not determined by mathematics, but on its effect in inducing belief." *Gifford v. Geosling,* 951 S.W.2d 641, 643 (Mo.App.1997) (internal quotation omitted). Consequently, a claim challenging a judgment as against the weight of the evidence "presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment, but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact." *Houston v. Crider,* 317 S.W.3d 178, 186 (Mo. App.2010).

[A]n against-the-weight-of-the-evidence challenge requires completion of four sequential steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Id.* at 187. It is within this framework that we address Father's second point.

In his second point, Father challenges the proposition that he failed to meet his burden of rebutting the presumption that Husband and Wife's marriage was valid. This satisfies the first step. Father then sets out, in detail, the evidence in the record he feels is contrary to this proposition, which satisfies the third step. Father fails, however, to cite any facts favorable to the trial court's judgment that the marriage was valid and, therefore, satisfies neither the second nor fourth steps set out *supra.* Father's failure to fully identify and develop the evidence favorable to the trial court's judgment necessarily undermines his ability to demonstrate how that evidence was so lacking in probative value that, when considered in the context of the totality of the evidence, it failed to induce belief in the existence of a valid marriage. *See id.* at 188. Granting Father's point would require this Court to compile its own demonstration of how the omitted favorable evidence is lacking in probative value so as to be against the weight of the evidence, which would transform this Court into an advocate for Father, a role we are prohibited from assuming. *See Boyd v. Boyd,* 134 S.W.3d 820, 824 (Mo. App.2004). Father's second point is de-

nied.[7]

### Decision

The trial court's judgment is affirmed.

BARNEY, P.J., and BURRELL, J., concur.

7. An *ex gratia* review of the record reveals that the trial court's judgment was not against the weight of the evidence. Under applicable Arkansas law, a party lacks the requisite mental capacity to marry if the party is "incapable of understanding the nature, effect, and consequences of the marriage." *Porter v. Ark. Dept. of Health & Human Servs.*, 374 Ark. 177, 286 S.W.3d 686, 696 (2008). "[C]lear reason, discernment, and sound judgment" are not necessary to enter into a marriage. *Id.* Furthermore, there is a presumption of validity: "Annulment of a marriage is the exception and not the rule, and must be granted only upon extraordinary facts.... The burden of proving the invalidity of a marriage rests upon him who asserts such invalidity, and a marriage will not be declared invalid except upon clear, cogent and convincing proof." *Blair*, 147 S.W.3d at 885 (internal citation omitted). The evidence presented to the trial court demonstrates that Husband and Wife are, and have been for over a decade, in a long-term, committed relationship; Husband desired to get married for some time before actually doing so; Husband repeatedly attempted to marry Wife and wants to remain married; Husband loves Wife and wants to take care of her for the rest of his life; and Husband may not understand the financial ramifications and responsibilities of marriage, but he does not handle his own finances nor those of Wife. Although Father includes the Florida order of guardianship as support for his argument, it cannot be considered for the reasons stated *supra*. The totality of the evidence—including the lack of an authenticated Florida order of guardianship—demonstrates that the trial court's finding that Father failed to meet his burden was not against the weight of the evidence.