

# Missouri Court of Appeals

## Southern District

### Division One

DOUG A. HOLMES, )
)
         Respondent, )
)
  vs. ) No. SD32396
)
AMY F. HOLMES, ) FILED: March 31, 2014
)
         Appellant. )

APPEAL FROM THE CIRCUIT COURT OF IRON COUNTY

Honorable Randy P. Schuller, Judge

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS

Amy Holmes challenges a dissolution judgment that divided marital property and awarded Doug Holmes sole legal and physical custody of their young daughter.[1] Amy contends that (1) the custody award is against the weight of evidence; (2) the court did not comply with § 452.375.2; (3) the property division is not fair and equitable; and (4) the court erred in calculating child support.

---

[1] Hereafter, we refer to the parties by their first names and to their daughter as "Child." Statutory citations are to RSMo as amended through 2010. Rule references are to Missouri Court Rules 2010.

Relief is merited in only one respect: a child support credit for overnight visitation. We reverse and remand to that extent and affirm the judgment otherwise.

## General Principles of Review

To quote Amy's brief, it "is well settled in Missouri that matters such as this are governed by the paramount decision in ***Murphy v. Carron***, 536 S.W.2d 30, 32 (Mo. banc 1976)," which requires that we affirm the trial court's judgment unless (1) no substantial evidence supports it; (2) it is against the weight of the evidence; or (3) it erroneously declares or applies the law.[2]

It is Amy's burden to show error. ***McCallum v. McCallum***, 128 S.W.3d 62, 66 (Mo.App. 2003). "We do not retry the case, rather we accept as true the evidence and reasonable inferences therefrom in the light most favorable to the prevailing party and disregard contradictory evidence." ***Id***. at 65.[3]

---

[2] Amy suggests that this standard may be flawed, asserting that "neither party has found a case in which the court of appeals has substantively reversed a lower court ruling related to custody in original custody awards in dissolution of marriage or paternity cases," and that "having a standard of review that gives the impression that substantive reversal is possible may be misleading." "Furthermore," Amy argues, "if substantive reversals on original custody determinations in the context of dissolutions or paternity actions do not occur under the 'no substantial evidence' challenge or the 'against the weight' challenge, the only remaining standard of review set out by *Murphy* is the trial court 'misstated or misapplied the law.'"

We decline to reexamine *Murphy* for several reasons. First, we are constitutionally bound to follow our supreme court's last controlling decision. *See **In re X.D.G.***, 340 S.W.3d 607, 619 (Mo.App. 2011). Second, without research at length, we find that Amy's premise overlooks at least ***Kroeger-Eberhart v. Eberhart***, 254 S.W.3d 38 (Mo.App. 2007), and this court's opinion in ***Marriage of Horinek***, 41 S.W.3d 897 (Mo.App. 2001). Finally, Amy questions our standard of review without proposing any change or showing how a change would alter the outcome here. Failure to develop an allegation of error by argument waives the issue. *See **In re K.A.C.***, 246 S.W.3d 537, 547 (Mo.App. 2008).

[3] We summarize facts throughout this opinion in accordance with the last-stated principle. We decline to publish, from a record well known to the parties, any more than is needed to understand our rulings on Amy's four points. This case is largely about unsubstantiated allegations and a child who is innocent in any event.

## Background

Amy married Doug in 2003. Child was born in 2006. Doug worked as an engineer. Amy kept the home and worked part-time. In April 2010, when Child was age 3, the family moved from Virginia to Missouri, temporarily living with Amy's parents until they found a house.

Amy took Child on a trip two months later. Unbeknownst to Doug, Amy also took $41,417 from the couple's bank accounts (leaving Doug $4.70),[4] cancelled their joint credit cards, "hotlined" a report that Doug had fondled or inappropriately touched Child, and got an ex parte order of child protection. For five months thereafter, Doug was not allowed to see or have any contact with Child.

Meanwhile, the Children's Division ("CD") investigated the allegations and, within a month, found them to be unsubstantiated. Amy promptly hotlined Doug again, adding allegations of oral sex and of an enlargement or stretching of Child's vagina. Following a second forensic interview and a medical examination finding no signs of sexual abuse, the CD also found these allegations unsubstantiated.

Authorities wanted Child to live, temporarily, with a neutral relative or friend. Doug and Amy could not agree on such a person. The juvenile officer then took custody of Child, who spent the next seven weeks in foster care. The foster parent noted no sexual or inappropriate behavior by Child. During this time, according to two trial witnesses, Child "apologized for the lies about her dad" and said "I'm just tired of the lies."

---

[4] Months later, when Child was in foster care, Amy sent $10,000 back to Doug.

In December 2010, Doug was granted a supervised visit with Child at the CD office. Child "was elated to see him – very excited to see her daddy" and "ran right to him," according to the CD supervisor who oversaw this "very joyful, playful, and appropriate visit," and testified that Child acted similarly at all of Doug's later visits.

Thereafter, authorities decided not to pursue extended judicial custody and instructed Amy and Doug to work out custody arrangements. For the next 19 months, Child stayed with Doug one week and with Amy the next.

Amy hotlined Doug yet again in March 2011, repeating allegations previously found to be unsubstantiated. The CD coded this third report "inappropriate" and closed it without further investigation.

At trial in August 2012, Amy opined that the CD "returned [Child] to a child abuser" and that Doug was still abusing Child, even to the time of trial. Amy testified that nothing could convince her otherwise, such that she even believes allegations that she knows are actually false. We quote Amy's trial testimony:

> Q. Is there anything that could be done that would convince you that Doug Holmes did not sexually abuse and is not sexually abusing your daughter?
>
> A. I don't know how not to believe my daughter. I don't know how to not believe her.
>
> Q. Even when she makes statements that he's abused her on the trampoline, which you know is false, correct?
>
> A. I think --
>
> Q. Is that correct?
>
> A. That's correct.
>
> Q. Even when she makes allegations that he's abused her at the circus, which you know is false?

4

A. That's correct.

* * *

Q. Okay. So Doug has never been on this trampoline with [Child], right? [5]

A. No, he hasn't.

Q. And so you're aware that [Child] made allegations that Doug had abused her on the trampoline; is that correct?

A. Yes.

Q. Do you believe those allegations?

A. Yes, I do.

Q. Even though Doug has never been on the trampoline with [Child]?

A. That's right.

Q. She's also alleged that he abused her at a circus; is that correct?

A. That's correct.

Q. Has Doug ever taken her to a circus?

A. No.

Q. So you believe that, too, though?

A. Yes.

Doug testified that he felt Amy had coached Child to lie about child abuse, alienated Child from Doug, tried to convince others that Doug abused Child, and was likely to persist in all of these. He requested sole legal and physical custody of Child. The guardian ad litem ("GAL") recommended likewise.[6]

---

[5] Amy previously testified that this trampoline was bought *after* she and Doug separated.

[6] A different GAL than was in the order of protection case.

In its judgment, the court found that Doug "has not abused the minor child in any way"; that Amy's behavior prior to and at trial "raise[d] questions as to her ability to properly raise the minor child, if the child resided with her primarily"; that Doug was the parent more likely to allow Child to have frequent, continuing, and meaningful contact with the other parent; and that it was in Child's best interest to remain in Doug's home and school district. The court further observed that Amy

> made two hot line calls, one on July 18, 2010 and one on August 12, 2010 and was involved in a third hot line call in April 2012. The first two hot line calls were extensively investigated by Children's Division. The first hot line call was reported unsubstantiated on August 30, 2010. The second hot line call was reported unsubstantiated on December 21, 2010. The third hot line call was determined to be an inappropriate report and was not investigated. A SAFE examination was conducted on August 5, 2010 at Cardinal Glennon Children's Hospital.... The Children's Division, the Juvenile Office and the medical personnel that conducted the SAFE exam found no evidence of sexual abuse.

The court also cited evidence that Child was assisted or coached in connection with reports, and that there were "two physically impossible reports, i.e., the trampoline incident and the circus incident."

Summing up, the court observed that Child "was subjected to two hot line calls, two Children's Division investigations, two psychological evaluations, two CAC interviews, and numerous visits to counselors and therapists," was taken to St. Louis for a SAFE exam, and had even spent time in foster care.

> From the record, the minor child was subjected to significant instability, originating from [Amy's] household. The record suggests that this instability may continue, based on [Amy's] April 2012 inappropriate report and [Amy's] statements at trial that she wanted [Doug's] parental rights terminated. A stable home with a good environment is the most important consideration as to custody.

> The more stable home appears to be [Doug's] and in the best interests of the minor child, [Doug] should have primary custody. [Amy] should have temporary custody and visitation as the Court deems appropriate.
>
> The Guardian ad Litem recommends that the custodial arrangement for the child remain in Rolla with [Doug], with visitation for [Amy].

Citing all these factors, the court found it in Child's best interest to award Doug sole legal and sole physical custody, with visitation to Amy. The judgment so ordered.

Amy was ordered to pay Doug $546 monthly child support. The court awarded the parties their respective vehicles, retirement and financial accounts, and personal property in their possession. The parties were to pay their own post-separation debts. There was no other marital debt to divide.

Amy appeals, raising four points.

## Point I – Child Custody

Amy contends that the custody decision was against the weight of the evidence and that she should have sole legal and physical custody of Child.

### Standard of Review

An appellate court will not disturb a custody decision unless it is manifestly wrong and the child's welfare requires some other disposition. *Marriage of Sisk*, 937 S.W.2d 727, 730 (Mo.App. 1996). "This court must presume the trial court awarded custody in the child's best interests, due to the trial court's superior position in judging the credibility of the witnesses, along with their character, sincerity, and other intangibles not completely revealed by the record." *Id*. The trial court was entitled "to believe or disbelieve all, part or none of the testimony of any

7

witness." *Id.*

To reiterate, we will affirm this custody award unless we are firmly convinced that Child's welfare demands another arrangement. ***Thorp v. Thorp***, 390 S.W.3d 871, 877 (Mo.App. 2013). "We afford greater deference to the trial court's decision in child custody determinations than in other cases." ***Sisk***, 937 S.W.2d at 730.

*Analysis*

Amy's Point I argument largely boils down to these assertions:

1. The record, properly weighed, proves that Doug abused Child and that she is not safe with him.[7]

2. To quote Amy directly: "The only way to reconcile the lower court's decision in this case is to recognize that, in the heat of advocacy, it was difficult for the lower court to see the amount of fallout from Fred Nolen's involvement."[8]

Our careful consideration of the record, in accordance with our standard of review, fails to convince us of either claim.

As to #1, Amy concedes (and, to some degree, complains) that appellate courts do not reweigh evidence in custody cases. "Regarding custody issues, we grant the trial court broad discretion and do not reweigh the evidence, even if the evidence may have supported another conclusion." ***Id.***; *see also* ***Durbin v. Durbin***, 226

---

[7] The dissent purports to disprove, as a proposition allegedly "necessary to sustain the judgment," that Amy prompted Child to falsely accuse Doug of child abuse. Slip op. at 2. That proposition is not necessary to sustain the judgment. The correctly-framed proposition "necessary to sustain the judgment" (and subject to the four-step analysis cited by the dissent) is that the custody award is in Child's best interest.

[8] The CD hired psychologist Fred Nolen (sometimes misspelled "Nolan" in the record) to evaluate Child and her parents after Amy's second hotline, and Doug called Nolen as a trial witness. Amy complains bitterly and at length that, *inter alia*, Nolen's "shoddy work" unduly influenced the CD; his reports "were the basis for taking [Child] into foster care"; and "foster care had a chilling effect on [Child]'s disclosures, particularly in light of the fear that she would be taken away from her Mother, which she was, after Nolen's reports."

S.W.3d 876, 879 (Mo.App. 2007). As noted previously, we give greater deference to trial courts in custody cases than in other litigation because trial courts are better positioned to judge the parties' credibility, sincerity, character, and other intangibles that we may be unable to glean from a cold record. *See **Durbin***, 226 S.W.3d at 879; ***Sisk***, 937 S.W.2d at 730. Ultimately, what was said in ***Durbin***, ***id.***, we also say here: "We have thoroughly reviewed the record and found that, while the evidence may also have supported a contrary decision, the evidence was more than sufficient to support the trial court's award of custody and that decision was not against the weight of the evidence."

As to #2, Amy complains that Nolen "tainted" this case; had he not been involved, Child "would never have been placed in foster care, she would never have been taken from her Mother, and she would have been able to process what was happening to her, therapeutically, and she would have been protected from her abuser."

Accepting that Nolen's report was flawed – the trial court said as much in its judgment – we cannot agree that Nolen or his actions swayed the outcome. The judgment mentions Nolen twice, neither time favorably, in a single paragraph which we earlier quoted in part and now quote more fully:

> The first two hot line calls were extensively investigated by Children's Division. The first hot line call was reported unsubstantiated on August 30, 2010. The second hot line call was reported unsubstantiated on December 21, 2010. The third hot line call was determined to be an inappropriate report and was not investigated. A SAFE examination was conducted on August 5, 2010 at Cardinal Glennon Children's Hospital. No indications of sexual abuse were reported. The Children's Division investigation included two CAC interviews, *a flawed report by Fred Nolan*, and countless

9

interviews by case workers. Substantial weight must be given to the investigation and conclusions of the Children's Division, *regardless of the value of the Nolan Report.* There were no reports of sexual abuse from Petitioner's day care provider, Respondent's babysitters, any family physician or the foster parents. The Children's Division, the Juvenile Office and the medical personnel that conducted the SAFE exam found no evidence of sexual abuse. [emphasis added]

Amy's effort to pin the custody award on Nolen finds little or no support in the record and none in the judgment.[9] Her fixation with Nolen ignores investigations and conclusions of two GALs, neither of whom believed that Doug abused Child. "[I]t is significant that, even though the trial court is not bound by the recommendation of the GAL concerning custody, it was the GAL's recommendation that Father be given primary custody of the child." *Sisk*, 937 S.W.2d at 731.

Returning to basics, we find further guidance in *Sisk*, a case like this one in several respects. There, as here, allegations of paternal sexual abuse were not substantiated. There, as here, the trial court "found that Father did not sexually abuse the child, awarded primary custody to Father and granted visitation rights to Mother." *Id*. at 730. There, as here, the mother raised an "against the weight" complaint on appeal. *Id*. at 729. What the appellate court said there also fits here:

> We do not minimize the seriousness of the allegations of sexual abuse in this or any case and have thoroughly reviewed the record. Resolution of the conflicts in evidence on this subject hinged largely on credibility. The trial court, however, is in a far better position to evaluate the credibility of witnesses than an appellate court and the resolution of conflicting evidence concerning the relative fitness of parents for custody is left to the trial court with deference to be accorded its conclusions.

*Id*. at 731 (quoting *Marriage of Patroske,* 888 S.W.2d 374, 383 (Mo.App. 1994)).

---

[9] The dissent details, at length, evidence supporting the trial court's determination that Nolen's work was "flawed" and to rest its custody decision on other evidence.

Here, as in **Sisk**, we have carefully reviewed the record and find no abuse of discretion as to custody. Perhaps more to the point, we are not firmly convinced that Child's welfare requires what Point I seeks: sole custody to Amy. Point denied.

## Point II – Statutory Findings

Point II also challenges the custody award, urging that "the court abdicated its fact finding responsibilities, failing to comply with the best interests requirements of § 452.375, RSMo, in that [Child's] welfare is at risk."

Yet this is *not* a claim of failure to make statutory findings; Amy expressly "acknowledges the trial court set out findings relative to § 452.375.2." The charge is *inaccuracy*, "that the court's findings have numerous errors and inconsistencies relative to the evidence presented at trial." This merely repackages Point I's failed argument in § 452.375 terms, so we simply reiterate that the custody award is supported by substantial evidence and is not against the weight of the evidence. Point II fails.

## Point III – Property Division

Amy alleges, on appeal, that she is on the short end of an 81%-19% property split. We find no error, but even if we did, Amy invited it by her own actions and requests at trial.

Amy expressly invited the trial court to credit her as having the net $31,359.45 that she had taken from joint accounts. She did so orally, on direct examination under her counsel's questioning. She also did so in writing, in her proposed "Distribution of Assets and Liabilities" (Amy's Exhibit C2). Crediting $31,359.45 to

Amy's side of the ledger, as she proposed at trial, puts her slightly ahead of Doug.[10]

Point denied.

## Point IV – Child Support

Finally, Amy asserts that her $546 monthly child support obligation "is unjust or inappropriate after consideration of all relevant factors."[11]  She argues principally that the court "failed to recognize [Doug's] unjustified underemployment" and thus erred in not imputing higher income to him.  She primarily cites ***Holmes v. Holmes***, 878 S.W.2d 906 (Mo.App. 1994), which recognizes that income may be imputed

> to prevent a spouse from escaping responsibilities to support minor children ... including where a spouse has: 1) voluntarily reduced his or her income without justification; and 2) involuntarily lost a job but failed to use his or her best efforts to obtain a new job, refused to accept employment offers, or failed to show that the unemployment was other than temporary.

***Id***. at 909 (internal cites omitted).

We presume the court did not think Doug changed careers to evade support obligations.[12]  Doug testified that he lost his engineering job because stress from the accusations against him hurt his performance.  Amy acknowledged that Doug previously sought engineering jobs nationwide but got only one job interview and offer.  ***Holmes*** is inapposite in our view.

---

[10] $31,359.45 + 9,090.96 other property = $40,450.41.  Doug received $38,828.59.

[11] We deem abandoned a second complaint ("no findings as to child support") which was not developed in the argument portion of the brief.  ***Hermann v. Heskett***, 403 S.W.3d 136, 142 (Mo.App. 2013).

[12] Neither party timely requested specific findings of fact.  Fact issues with no express findings are deemed to have been resolved in accordance with the result.  ***Marriage of Davis***, 378 S.W.3d 426, 427 (Mo.App. 2012); Rule 73.01(c).

We cannot say the trial court abused its discretion in not imputing income to Doug or in excluding income from his sporadic secondary employment.[13] "The trial court's inclusion or exclusion of earnings from secondary employment benefits is discretionary." *Thorp*, 390 S.W.3d at 879 (citing *Bridgeman v. Bridgeman*, 63 S.W.3d 686, 690 (Mo.App. 2002)).

However, Doug concedes that Amy should have been given a Form 14, Line 11 child support credit for overnight visitation.[14] We agree, reverse the child support award in that respect only, and remand with directions to determine the appropriate credit and enter a judgment adjusting child support accordingly.

## Conclusion

We reverse in part and remand the child support award as previously stated, and affirm the judgment in all other respects.[15]

DANIEL E. SCOTT, J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, P.J. – DISSENTS IN SEPARATE OPINION

WILLIAM W. FRANCIS, JR., C. J. – CONCURS

---

[13] Doug served on some National Science Foundation panels, but this work varied year to year. He also worked part-time for an engineering firm prior to trial so he could pay expenses in the dissolution case.

[14] To quote Doug's brief:

Father would concede that the Court should have given Mother the overnight credit she is entitled to based on the Court's parenting plan. Father's Form 14 did not include an overnight visitation credit because Father was proposing no overnight visitation for Mother. Since the Court adopted its own parenting plan which included overnight visitation for Mother, the overnight visitation credit should have been included in the calculation for child support. Father believes that Mother would be entitled to a 6% credit for overnight visitation based on the number of overnight periods awarded in the parenting plan. Based on awarding a 6% credit for overnight visitation the new presumed child support amount would be $494.

[15] The court commends counsel for both parties for their professionalism throughout this appeal.



# Missouri Court of Appeals

## Southern District

### Division One

DOUG A. HOLMES, )
)
      Petitioner-Respondent, )
)
vs. )     No. SD32396
)
AMY F. HOLMES, )
)
      Respondent-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF IRON COUNTY

Honorable Randy P. Schuller, Special Judge

**DISSENT**

I respectfully dissent. Acknowledging the deference that is due the trial court in one of the most disturbing dissolution cases that I have reviewed, I believe the trial court erred in awarding Father sole custody of the four-year-old child. I note that, at the end of the evidence, the guardian ad litem ("GAL") who represented the child suggested that a neutral therapist meet with all of the parties. That never happened. Instead, the trial court decided that Father had not sexually abused the child and, by inference, that Mother was at fault for the allegations. That decision stemmed from the work of a licensed psychologist, Dr. Frederick Nolen. Although the court claimed it "rejected other parts of the [trial] testimony as not credible" and referred to Dr.

Nolen's report twice in its judgment as the "flawed report by Fred Nol[e]n" and "regardless of the value of the Nol[e]n Report," it is clear in reviewing the evidence that it was not possible to separate Dr. Nolen's influence on the juvenile court, the Children's Division, and in the trial.

Mother acknowledges the difficulty in prevailing on an "against the weight of the evidence claim." She identifies the steps per *In re Marriage of Oakley*, 340 S.W.3d 628 (Mo. App. S.D. 2011):

> "(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
> (2) identify all of the favorable evidence in the record supporting the existence of that proposition;
> (3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
> (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition."

*Id.* at 637 (quoting *Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010)). The challenged proposition is that Mother prompted her daughter to make false sexual abuse allegations against Father. The favorable evidence supporting that proposition stems from Dr. Nolen's report. As set forth below, I believe that favorable evidence, along with all reasonable inferences, is so lacking in probative value that it failed to induce belief in that proposition. The majority opinion glosses over the conclusions reached by the decision-makers, including the GAL and juvenile court, but fails to analyze the underlying evidence that supports those conclusions.

Dr. Nolen was brought into the investigation by Children's Services after the minor child disclosed to a therapist (Connilee Christie) during a second CAC interview in August 2010 that she and Father played some "games" together. The child pointed to her genital area and said that

2

Father puts his head there and she pointed to places on the diagrams where he touched her. Jessica Homeyer, a Children's Division case worker, requested psychological and parenting assessments on the adults and a psychological evaluation on the child. Homeyer, who had been on the job for ten months, told Dr. Nolen prior to the interviews that she suspected the child was being coached and the allegations were not true. Dr. Nolen did not receive any information regarding the facts of the case prior to doing the evaluations and did not "specifically" know the purpose of doing the evaluations. He is a traveling therapist who does reports for the Children's Division, and gets referrals from social services, juvenile offices, and private therapists throughout the state, except the Springfield area. He issued reports in November of 2010.

Dr. Nolen did something that no reputable therapist would do. He stated with absolute certainty that the child's statements were false. Then, based on his interviews, an encounter with Mother on April 3, 2011, and "other e-mails"[1] that Father had sent him subsequently, he came to the conclusion that there was absolutely no possibility that Father had abused the child.[2] That is an important conclusion and one that is disturbing. But more disturbing is the manner in which Dr. Nolen arrived at his conclusions. He reasoned that if the child's statements were false, then Mother must have been at fault for the child making the statements. Dr. Nolen indicated, in an absolutely bizarre report, that he must "rule out for factitious disorder of [Mother] in [his] report of her." As a result of his conclusions in his report to the juvenile office, the child was taken into foster care.

---

[1] During his testimony, Dr. Nolen repeatedly referenced other information and e-mails Father had sent him that, if valid, "support the diagnosis strongly" regarding his conclusions about Mother's mental and emotional issues. In fact, after the April 3rd encounter, Father continued to send Dr. Nolen e-mails that "further confirmed [Dr. Nolen's] belief, [his] diagnosis"; however, he would not be specific about how many e-mails he had received from Father. None of the e-mails were available at the hearing. Dr. Nolen had not been paid at the time of trial, but anticipated payment from Father.

[2] Dr. Nolen testified his opinion was "[b]ased on the entire information obtained from everybody everywhere."

After Dr. Nolen's initial testing, he was hired by Father for the dissolution. When Mother went to Father's apartment on April 3, 2011, Dr. Nolen was there attempting to re-interview the child. Prior to this event, Dr. Nolen had contacted Mother repeatedly asking to re-interview her and the child. She and her attorneys would not agree to further interviews unless Father agreed to be interviewed by a different therapist. Dr. Nolen then knew he did not have Mother's permission to engage in further testing of the minor child.

After Mother refused permission for further testing by Father's expert, Dr. Nolen prepared an unsolicited report to the juvenile court requesting that Mother have no contact with the child. Once again, the juvenile court responded by denying custody and visitation to Mother for three weeks.[3] He described Mother's behavior as "histrionic in terms of excessively unnecessarily emotional, very agitated."[4] The report does not contain the names of the "reliable collateral informants that Father named for [Dr. Nolen]."

When asked about his unsolicited report, Dr. Nolen replied, "If I had a serious concern about a child's safety, I'm mandated to contact the authorities." His "concern" was based on information from Father that was not validated by any witness or testimony. In fact, Dr. Nolen told Father to validate the concerns himself or give it to the authorities to have it validated. Despite that advice to Father, Dr. Nolen then proceeded to ask the juvenile officer to take the child into protective custody again "[b]ased on [Mother's] behaviors" at the April 3rd encounter.

Virtually every therapist who testified disputed Dr. Nolen's methods and results. Briefly, (1) Dr. Nolen made up an inventory to test the child which had absolutely no validity, reliability, or peer testing, (2) he inappropriately used adult tests on the minor child, (3) he drew conclusions

---

[3] When Mother challenged Dr. Nolen's behavior as unethical as he did not have consent, Dr. Nolen claimed the consent form was good for one year after the date of signature.

[4] Father also had "elevated histrionic personality score."

from a psychomotor test that cannot be used to support those conclusions, (4) he created a diagnosis of Mother out of whole cloth, (5) he was hired by Father as an expert in a dissolution but failed to inform the court of this very different role, (6) he arrived at a conclusion and in an inflammatory manner presented the results to the court, and, most importantly, (7) he failed to investigate the further allegations of a four-year-old child or recommend counseling for the child.

It is necessary to commence with Dr. Nolen's testing methods in order to challenge his conclusion regarding Mother. Dr. Nolen used a test he called the "Nolen Trauma Inventory." He claimed it has not been "normed" as a "standalone published inventory," but he claims it is still a trauma interview. He described it as a "compilation of many symptoms that indicate physical or sexual trauma . . . taken from the literature of peer reviewed, published in national journals, as indicated of trauma." He claimed it was published "within different articles [he's] written," and that the information to validate that it has been peer reviewed is available from a CD workshop company that sells his home studies in Jacksonville, Florida. Important to this case is that he relied on this baseless trauma inventory when doing his evaluations.

Additionally, Dr. Nolen made the diagnosis of factitious disorder as a rule out on October 26, 2010, based on only one contact with Mother, one contact with the child, and one contact with Father. He did not review any other information from other counselors or medical information related to the child. He was looking for "collateral validation" of his diagnosis when Father asked for his help in the custody decision. Dr. Nolen considered his attempted interview of the child and the encounter with Mother on April 3, 2011, as the additional validation he needed. Dr. Nolen claimed Mother's "histrionic subscale was also extremely elevated" and that indicates she "does things to intentionally attract attention to herself." He concluded that he

5

could rule out "possibly factitious disorder[5] on Axis I" for Mother. He then said "there might be another heinous[6] process occurring here" and used the term "Munchausen's syndrome by proxy" in his report to the juvenile court. He did not support that diagnosis with any diagnostic data and he did not explain how this diagnosis applied to Mother, he simply threw out a possibility. Dr. Nolen further said that people with too much histrionics "create a lot of chaos that's focused on getting attention to themselves." He did not determine anything about the way either parent was able and willing to perform functions of a mother and a father. Dr. Nolen's concern regarding Mother's parenting was his diagnosis of Munchausen's by proxy.

Although, in Dr. Nolen's first interview with the child, the child disclosed allegations of abuse by Father, he disregarded all of them by concluding they were false. After the first meeting, he ruled out "any true sexual abuse to [the child]" by Father. There is no explanation what he considered "true sexual abuse." He reported that 100 percent of his data did not show any sexual abuse. He claimed, "There would have to be physical forensic evidence done to 100 percent confirm it across the board." Dr. Nolen further stated that "if somebody does have forensic physical evidence of being sexually abused, that would override [his] conclusions." He did not suggest any follow-up or further investigation, or recommend counseling for the child.

Dr. Nolen testified that he discounted the child's statements to him because the "nature of [the child's] presentation of that information to me that [Father] had allegedly sexually abused

---

[5] Dr. Nolen testified this was "production or claims of either physical problems, psychological problems, or both with the intent of garnering attention – pulling attention to oneself." After one interview with Mother, he decided it was possible she had factitious disorder.

[6] Dr. Nolen elaborated that he used the term

> heinous because we all have conflicts. We all have differences. We all have arguments, but only the truly mentally ill stoop to such low levels as to accuse a parent of the most degrading action they can do: defile their own child. Placing such false evil in the minds of children can seriously distort their perceptions of their parents' true goodness, turning the child against the adults who are supposed to be their prime protectors and educators about morality: their parents.

6

her made [Dr. Nolen] suspicious that it was not true." He further opined: "Children are not always accurate. Children are not always honest. Children do not always fully clearly perceive what's going on around them."[7] He ruled out sexual abuse on his first and only visit with the child.

Further, it is alarming that after Dr. Nolen was hired by the juvenile court to be a neutral investigator he stayed in contact with Father and advocated for Father in the custody dispute. He testified his final conclusion at the time of trial was confirmed partly on the basis of Father's e-mails to him, but he would not say what was in the e-mails or even how many he had received. At no time did he inform the court or juvenile office of this dual role. He based his conclusion on what he was told by Father, but does not know if what was told to him was true or not; he told Father to "validate it." He did not make a hotline, rather, he wrote a letter to the court directly. Dr. Nolen claims that his interviews with Mother, Father, and the child, his encounter with Mother on April 3rd, and "all of the other information from other sources" added up to confirm his previous diagnosis of Munchausen's by proxy. Dr. Nolen's letter to the court stated: "I hereby petition the Court to suspend any and all contact between [Mother] and [the child]." He also asked for a ban on Mother's parents even though he had never talked to them. Dr. Nolen was casual about the possibility of the child entering into and returning from foster care.

Mother recorded the interview that Dr. Nolen had with the child with a baby monitor. The experts employed by Mother had the original tape and the transcript available for their analysis of Dr. Nolen's methods and conclusions.

---

[7] Even if this statement were true, it does not indict Mother. Dr. Nolen did not disclose his training in diagnostic efforts with children.

7

Dr. James Harnsberger

Dr. Nolen based his conclusion that the child had been coached on the child's demeanor and vocabulary. A linguistic expert, Dr. James Harnsberger, reviewed Dr. Olsson's[8] findings and verified the transcription of the interviews by Dr. Nolen. The two critical words in question that Dr. Olsson focused on were "uncomfortable" and a form of the word "vagina." Dr. Harnsberger analyzed a portion of Dr. Nolen's report which claimed those are not words you would ever find in the vocabulary of a four year old. Dr. Olsson claimed that while not typical it would not be unusual for someone with very advanced verbal abilities. On the issue of blurting, Dr. Harnsberger concurred in Dr. Olsson's opinion that the child's responses were neither inappropriate in their content nor inappropriately timed. On the issue of congruent emotion, both Drs. Olsson and Harnsberger concurred that the child spoke spontaneously with the emotion you might expect in a spontaneous conversation. These findings were in disagreement with Dr. Nolen's characterization of the child's congruent emotion and blurting. Dr. Harnsberger noted that anyone claiming they have a detection system of any kind should be able to report both the rate or the frequency with which it successfully detects what it is looking for paired with the false alarm rate (how often the test inappropriately labels a signal as present when it is absent); Dr. Nolen's report lacked such validation.

Dr. Richard Scott

Dr. Richard Scott is a certified forensic examiner and is in private practice as a psychologist. He analyzed the reports of Dr. Nolen. He stated that a psychologist can never diagnose a clinical disorder based on a single psychological test. Psychologists do not even diagnose mental retardation based on an intelligence test because it is based on incorrect data. He was critical of every aspect of Dr. Nolen's testing on Mother and said it was not valid.

---

[8] Dr. Olsson was a forensic linguistic expert Mother hired to analyze the interviews done by Dr. Nolen.

First, Dr. Scott noted there is no such thing as Nolen's Trauma Inventory - a series of questions Dr. Nolen pulled from literature at will, no articles, no peer reviews or published works testing it to see if it is credible. It is not a recognized psychological test. There are other tests but Dr. Nolen did not use them, and the ones Dr. Nolen did use, he more often than not used them incorrectly. As to the specific tests used by Dr. Nolen, even the intelligence test was too simple a test and not full-length.

With regard to the Millon Clinical Multiaxial Inventory (the test used to claim Mother was histrionic), Dr. Scott agreed it was acceptable for use in a forensic context; however, the problem with such a test is that "it weighs very heavily on psychopathology." That means it overestimates the likelihood of psychopathology, of problems in character, when we may simply have traits that are not of a clinically significant level. The test is also sensitive to response bias, meaning the person taking the test can approach it in a variety of ways; the person being tested can be open and honest, or attempt to present themselves very favorably as is common in custody, parenting, or personnel evaluations. In a custody or parenting context, positive self-presentation is very common and exposes a weakness in the test. If a man presents himself as too positive, he comes across as very narcissistic; women who do this come across as histrionic, or overly emotional, shallow, extremely flirtatious, or overtly sexualized. He criticized Dr. Nolen's finding of histrionic personality disorder because (1) you should never diagnose a clinical disorder based on a single psychological test; and (2) it could be based on incorrect data if it is a false finding based on Mother being too positive in her self-presentation.

As for Dr. Nolen's use of the Bender Motor Gestalt test, Dr. Scott testified that no valid interpretations about personality can be made from it. It is "a test of psychomotor ability or development. It is used more often with children than with adults any longer and there are norms

9

for assessing the development of hand-eye coordination or the ability to integrate visual and motor activities." Also, if Dr. Nolen viewed them as therapeutic hypotheses, they are not appropriate in a forensic context. They are "fine in therapy to explore and consider, rule in and rule out, but to toss them into a case involving the parenting of a child and who should get custody and whether a mother is causing problems for her daughter, it's inappropriate because again they're not reliable." Forensic opinions, such as the ones Dr. Nolen presented to the court, should be based on reliable and valid data that is corroborated across sources and presented to a reasonable degree of psychological certainty to the court. They should not be presented as hypotheses in a report to be used by lawyers and a judge in determining child custody. Dr. Scott testified:

> A test must be reliable, it must be generally accepted to be used in a civil case in Missouri. And – and I'm not speaking as an attorney. This is part of my training as a forensic psychologist to know what I should and shouldn't use and present to the Court as supported by reliable and valid data.

Dr. Nolen's statement -- that if a child inverted the father-figure card, she was likely abused by the father, but that children who are abused by other men do not -- has no foundation in fact. In other words, there is no validity to that testing idea. Dr. Scott was further critical as he noted that Dr. Nolen admitted he did not administer the test in standard fashion. "If you don't use a test in its standardized method, the results mean nothing, and that's just plain and simple." Even if the test had been appropriately administered, "[t]here is no empirical data that links Bender-Gestalt results to child sexual abuse, just hypothesis."

Dr. Scott noted that Dr. Nolen did not get any history of the child, pregnancy, or milestones. Dr. Nolen did use the Adult and Adolescent Parenting Inventory; it is a test with known reliability and validity, is published, and is generally accepted. Dr. Nolen administered and interpreted it properly and the results clearly state Mother was not similar to abusive parents

10

and none of the results would link her to a risk for abuse. However, the results are inconsistent with Dr. Nolen's conclusion that Mother suffers Munchausen's by proxy or, more properly, factitious disorder. Dr. Scott testified, "I see no link in his reasoning or in this – in the way he drew his conclusion." It would seem Dr. Nolen's own report is internally inconsistent with his testing and results. Dr. Scott further testified, "[t]his data certainly is not consistent with her suffering this condition" and "[a] rule out or a provisional finding is not supported by this in any way." During the Gardner Disciplinary Attitudes Questionnaire, Dr. Nolen even mixed up the examples of "reactive" and "proactive" parenting.

Dr. Scott testified the Child Behavior Checklist is a good tool, but Dr. Nolen "extended the interpretation too far" when both Mother and Father agreed the child showed no significant behavioral issues. Dr. Nolen said that the child was not sexually abused given the absence of behavioral problems and that is not necessarily accurate or supported by empirical research.[9]

Dr. Nolen used the Phonetic Apperception Test even though it has no known reliability, there are alternatives, and it is for adults, making no sense to apply it to a four-year-old child. Further, Dr. Nolen "expressed surprise in his report that a child with a 120 estimated IQ would tell complex stories" and that is a bit of a paradox – a child with superior verbal comprehension skills would tell stories that are more complex than a child who is of average or below-average intelligence at the same age. Dr. Nolen also declared the child unreliable, which Dr. Scott said was not a logical conclusion. Dr. Scott stated the child is likely to be unreliable for one reason only – she was four. The literature shows that children at that age are largely unreliable because they themselves do not separate very well what happens to them from what happens to other people or what they are told has happened to them.

---

[9] Dr. Nolen did not check with the child's therapist to ascertain if there were behavior problems.

11

Dr. Nolen's main diagnoses, the Munchausen's by proxy and the histrionic personality disorder, are offered as though they are diagnostic and statistical manual disorders. This is problematic in that: (1) it is not proper to diagnose a personality disorder based on a single test, and (2) Munchausen's by proxy "means that the person is trying to create illness in another person in order to benefit from the sympathy and support in the caretaker, perhaps hero role that the person causing the illness will . . . experience." There is not a Munchausen's by proxy in the DSM-IV-TR, so presenting it as though it's a DSM-IV-TR diagnosis is not proper. Factitious disorder is "where the person presents themselves as persistently sick, and they do things to promote their own illness to take on the sick role where they get the sympathy, the support, and caretaking of others." Factitious disorder is in the DSM-IV-TR, but Dr. Nolen "diagnosed it as though the DSM recognizes a perpetrator type of Munchausen's and that's just not -- it's not in there at all." Dr. Scott believes Munchausen's by proxy exists, but it does not have the kind of diagnostic clarity, diagnostic specificity, and reliability that would make it a "disorder." He testified that, likewise, parental alienation is not a mental disorder, per se, and that appears to be what Dr. Nolen is really alleging.

Dr. Scott asserted that none of Dr. Nolen's conclusions could be founded on the limited data acquired by spending one hour with someone and running all of these tests in a vacuum. Dr. Scott's general concerns about Dr. Nolen's evaluations include (1) other and better tests available; (2) short duration of interviews – more in-depth interviewing, etc., would be required; (3) approach was biased – language throughout was very inflammatory, Dr. Scott referred to it as "preaching," as if Dr. Nolen wanted to usurp the decision-maker's role; (4) no data supporting Munchausen's by proxy; and (5) no mention of parental alienation, which makes him worry Dr. Nolen did not look at all possible options but instead "came to a conclusion and wrote the report

12

to support that conclusion." In this case, Dr. Scott does not see data that supports either Munchausen's or histrionic diagnoses. Basically, Dr. Nolen had a "25% chance of being right with a dart." Dr. Scott's impression was that "every bit of data was turned in the direction of what ultimately was [Dr. Nolen's] conclusion when there were more neutral ways to present the data even if those were his conclusions."

It concerned Dr. Scott that Dr. Nolen rendered a conclusion that the child could return to her father if she was not afraid of him, which tells him that Dr. Nolen saw something that told him the child may be fearful of Father. Dr. Nolen's insertion in the equation was more harmful to child than positive. The problem is that no one knew how invalid his testing was. Dr. Nolen even used the term "histrionic" incorrectly when he described Mother's behavior at one point as such, but Dr. Scott stated "hysterical" would be the proper term as she lost emotional control versus being seductive and shallow. All the data was turned in the direction of Dr. Nolen's ultimate conclusion. Dr. Scott stated psychologists should not be "moralistic and judgmental . . . and work for the court." Dr. Nolen violated the APA ethics code in not avoiding conflictual dual-role relationships as "[y]ou can't keep the roles separate." He believed Dr. Nolen's "whole assessment . . . has interfered with figuring out what really happened" with this little girl.

### CAC Interviewer

The child made allegations of abuse to the CAC interviewer, Connilee Christie. Christie commented that she just gathers the information and does not get involved in the determination of whether or not abuse actually occurred. She conducted the CAC interviews with the child. Homeyer testified that Connilee Christie told her it did not seem the child had been coached. Christie was asked if there was anything about the child's behavior that seemed like her

13

responses were contrived, to which she replied: "I wouldn't say there was anything that really stood out, no."

### Dr. Ann Beatty

Dr. Ann Beatty is a clinical psychologist who looked at the child's second interview. She attended special training to work toward doing interviews better to get more of a response in terms of disclosures. The recommendation was that it was better to give at least five interviews on a particular subset of children that did not disclose during the first interview in order to get a good disclosure. She reviewed the child's second interview at the CAC and felt the interviewer did a good job. The disclosure was appropriate for the child's age and it says a lot in the fact that it was pieced out instead of coming out all at once – Dr. Beatty placed a lot of value on that. She did not have any concerns that the child was coached, in part because the disclosure was piecemealed out. "Children that have been coached tend to walk in like little soldiers and tell you the first thing out of their mouth what they're supposed to say." Based on her review, Dr. Beatty feels that something probably happened to the child. It would not be unusual for a three or four year old to make allegations that cannot be factually true. She would chalk that up to the child's age and not being able to recognize time and place. She would look at the whole picture, not just one thing. The fact that Dr. Beatty does not believe the child was coached does not necessarily make the child's allegations true as she could still be either relating some fantasy that she has had or relating something that is just untrue.

### Christi Brandenstein

Christi Brandenstein is a licensed professional counselor; she is not a forensic counselor. She saw the child when Mother took the child to see her in July 2010. Mother did not say Father was sexually abusing the child; she suspected there had been some trauma and was concerned

14

about the child. Brandenstein's role was to help the child through whatever internal conflicts and distress she was experiencing. She engaged the child in child-centered play therapy. She found the child to be very agitated and to be experiencing some significant internal conflicts. She drew the conclusion that the child was in a great deal of distress and there were a lot of themes of being trapped, fearing a villain/perpetrator, and intense and demonstrative emotions that she described as agony and were not typical for a child that age.

Mother asked the counselor what to do with the information she received from the child and Brandenstein encouraged her to make a hotline call and take the child to see a forensically trained counselor. Although the child did not verbally disclose abuse to her, Brandenstein "considered [the child's] behavior to warrant enough concern for [her] that it was not inconsistent with a child who was being abused and that it was then time for someone to look into it on a deeper level who has the forensic training." She recommended the child have less contact with Father based on the child exhibiting a great deal of distress initially that seemed to diminish with absence from Father – she saw some correlation in those two things.

### Deanna Vito

Another counselor working with the child, Deanna Vito, sent Homeyer three letters after visiting with the child. Vito is a trained forensic interviewer and the CAC frequently referred people to her. Vito reported that the child demonstrated to her what happened with Father by spreading her legs and pointing her finger at her vaginal area with an in and out motion. Vito further reported that the child continued to make disclosures, was consistent in indicating that Father put himself right there (pointing between her legs), and said she felt mad, sad, and confused because "she doesn't want to do what Daddy did." When discussing her scared feelings, the child told Vito that "I'm in a cave and I am trapped. I can't get out, I'm trapped."

15

The child also disclosed that: "Daddy said he would kill Mommy. She also stated that Daddy said he would take me away. [The child] was visibly scared as she repeated these statements. This therapist continued to reassure her and resumed play activities to reduce her distress."

Although the child was scared her mother would be taken away, therapy was discontinued during the child's time in foster care and Vito recommended for the child to continue therapy to provide consistency and security. Vito was concerned that the child acted with the correct emotion when saying she was scared that her dad was going to take her away from her mom. Both counselors, Brandenstein and Vito, were concerned about the child and the Children's Division recommended the child continue therapy with Vito.

### Dr. Betty Schlesing

Dr. Betty Schlesing, a clinical psychologist, did a psychological evaluation on the child on December 2, 2010. She met with the child for approximately two and a half to three hours. Mother wanted her to do a mental, emotional, and behavioral evaluation of the child and find out what was wrong to cause the child's behaviors. The behaviors Mother reported included: the child got upset if she was playing on the playground and other kids got too near her; she would try to lick Father's ears; she was interested in boys at an early age; she sucked on her arm a lot; she slept a lot; and she alleged that "her daddy had done something scary." The child had acted out sexually.

Dr. Schlesing found the child to be anxious and depressed, which intensified when the child talked about Father. The child shuffled her feet back and forth like she was anxious. She noted the child is very verbal, with an expressive language score in the 75th percentile. She drew a picture of her and Father in some kind of cave, drew one of herself with tears running down her face when Father was touching her, and drew a picture of her family, mom, nana and grandpa.

16

She identified body parts as she knew them.  The child used the children's names for body parts, such as "gina", "hiney", and "rethra", and asked for pictures to circle so that she did not have to say bad words.  The child said Father touched her in those private parts, said it was vagina, tickling up the legs, and circled the breast parts.  The child's scores on the child sexual behavior inventory were consistent with children who have been sexually abused.

The data from the Children's Apperception Test and the pictures suggested intrusive, unwanted memories of the traumas she had suffered, as did her behaviors, and that is consistent with a posttraumatic stress type of disorder.  Based on the child's personality type and intelligence, Dr. Schlesing would expect the child "to be able to be very verbal and outgoing and talk to Father and pretend that nothing happened."  There could be no outward signs that Father had abused her unless she got alone with him.  When asked if it made a difference in her diagnosis whether the child's memories were real or created/someone told her it happened, Dr. Schlesing replied:  "They're real to her.  Whether or not she perceives them correctly or accurately or not, they're real to her" and "it's hard to say that somebody told her that they happened because of her stress level.  Her stress level wouldn't be so high if – if something didn't happen to – to trigger these."

With regard to a question about the child saying she was sorry for all of the lies, Dr. Schlesing stated,

> Well, there could be several reasons for her to say that to her foster parent.  She might want to get back out of the situation.  Children do not like to be in this kind of situation for an extensive amount of time.  They – they want to be back with Mom or Dad, whoever their family – they perceive their family – grandma, grandpa, and they don't like having to deal with all the aftermath of the disclosure.

In the child's stories, "she indicated that she felt like she was at fault for the abuse and that's a guilt on the part of the child."  Dr. Schlesing testified that "a lot of people don't believe sexual

17

abuse occurs to children" and that she can only testify as to what she saw, heard, and the test data showed. Her testing did not show any signs that the child's prior involvement with a psychological evaluation, CAC interviews, and counseling had any effect on her testing. It would have shown up with less anxiety, greater sense of security, better self-esteem, reduced depression, and those types of things.

Dr. Schlesing reported that the "indicators that she evaluated indicated strong probability that [the child] was sexually abused by [Father.]" She recommended that the child continue with counseling and that if there was any contact with the alleged perpetrator it be in a therapeutic setting and supervised. What is concerning is the undisputed fact that this child disclosed to every therapist that worked with her that her father was behaving in an inappropriate manner. Despite all of the reports from the CAC interviewer, two children's therapists, and two child forensic interviewers, the child has never had therapeutic counseling, nor has Father.[10]

### Lacking in Probative Value

The child was put into juvenile care on December 6, 2010; Homeyer testified that they "wanted [the child] to go to a nonbiased friend, relative, family member" but the parents could not agree on someone so the child went into foster care.[11] Homeyer said the decision was based on Dr. Nolen's opinion, Mother's behaviors, Mother refusing to leave her mother's home, and concerns about Mother's mother. She testified that, "We wanted [the child] to be in a neutral place because we were concerned about coaching, so we wanted her to be in a neutral environment where no one was coaching her and nobody possibly was sexually abusing her."

---

[10] I cannot help but note that we have affirmed criminal convictions and the termination of parental rights on less evidence than this.

[11] The court clarified what happened when the child was taken into custody in December 2010, by recollecting that, "Myself and all of the lawyers were in chambers when the juvenile officer removed the child because we were on the verge of settling and they came and said they had removed the child which blew it up[.]"

18

None of the counselors, other than Dr. Nolen, indicated that Mother was coaching the child. There was the inflammatory "diagnosis" of "Munchausen's by proxy" from Dr. Nolen's psychological evaluation of Mother. Homeyer was only "a little bit" familiar with Munchausen's and had never had a case involving the diagnosis. She believed Dr. Nolen based his diagnosis on the amount of counselors the child had seen and "just the rule out." Yet, all of the other professionals Mother had taken the child to see reported that Mother had valid reasons to be concerned about the child.

The majority opinion relies upon a statement made at trial that the child apologized for lying. The testimony actually was that at one point the child told her foster mother that "she was tired of the lies." The foster mother had asked the child if she was scared, but the child said, "no, I'm just tired of the lies" and the foster mother could not get her to open up more than that. The child did not say who was lying, but the majority opinion seems to have taken that to mean the child's lies or Mother's lies. They further inferred it was Mother coaching the child to lie.

The foster mother characterized the child's first visit with Mother as "very intense" as both the child and Mother were very excited to see each other and then very upset to leave one another. They were clinging to each other and the child was crying. Child would make comments that she wanted to see both parents. She seemed to love both parents very much and had different interactions with them. The child's interaction with Father was calmer, such as reading, whereas her interaction with Mother was a lot of play acting. To comfort herself, the child would sometimes suck on her arm if she got nervous, sad, or uncomfortable.

As the child's therapist noted, the child perceives herself as to blame for what happened. She was taken from her primary parent and placed with strangers for over a month at Christmastime. This was a direct result of Dr. Nolen's report.

19

The majority opinion suggests that the first GAL, Lindell Dunivan, concluded there was no abuse. Dunivan reasoned that because Father "passed" a lie detector test and Mother did not take one, Mother was the culprit. He concluded with the logic that if no abuse occurred, then Mother made it up. He advised Father that the only way to get the allegations "off him" was to do a polygraph and that, as far as he was concerned as the GAL, passing a polygraph would do that. His opinion that Father had not sexually abused the child was not based in any part on Dr. Nolen's evaluations, but was based largely on the polygraph and his own observations in attending the depositions. It caused him some concern that Mother refused to do a polygraph and initially refused to do a psychological evaluation. He claimed that once "the other side wouldn't cooperate, [he] was pretty sure we were looking at the right perpetrator." He acknowledged that he does not know if it was Mother or her attorney that did not want the polygraph test, but he had the impression that it was Mother and the grandmother who made that decision. Mother testified that she made repeated attempts with a polygraph administrator to schedule a polygraph for herself and her mother. She further stated that Dunivan was under a false impression that she was refusing to take a test.

Despite the child's disclosures to multiple counselors, Dunivan believed that the child was coached and told what to say. He testified: "After [Father] passed the polygraph, that convinced me he didn't have any sexual-abuse problem. And then when the parent, the natural mother wouldn't take the polygraph, I – I believed that she and her mother had been coaching the child." He did not think the reports from the counselors were valid because he thought, "the child was coached before she went to the counselor." Although he acknowledged that polygraph results are not scientifically sound enough to be admitted into evidence, Dunivan thought the polygraph trumped whatever other evidence there was. He went so far as to admit that once

20

Father passed a polygraph test "it didn't matter what [the child] ever said to anybody at any time," and that "nothing that [the child] had said really made any difference to [him] as her advocate[.]" Mother subsequently took a stress test and passed; however, Dunivan did not think stress test results were "worth very much" and discounted them. He testified that at this point he was no longer "objective" as he had an opinion about who was telling the truth in this case and who was not. He claimed the counselors were not objective either as they were paid by Mother or the grandmother "so what they're saying is not really worth very much." Despite that conclusion, he had the impression that "both of these people are pretty intelligent, pretty capable people and able to take care of a child." If you take away the allegations, "They're on equal ground, I think, if you wipe away all those allegations back and forth and either party could give the child a home and they probably ought to have substantial time with the child, both of them."

Father admitted Mother was the primary caretaker of the child, but he wanted to limit her visits because of Dr. Nolen's evaluation and the first GAL. Both parents had mirror images of a parenting plan that requested the other have no contact that was unsupervised. Dr. Nolen testified that there was a "documented history of [Mother] preventing [Father] from having contact with [the child], although she may have believed she had good reason." Both parents had enrolled the child in their home school districts and neither communicated with the other. Only Mother asked that the child not be placed in foster care; Father thought it was fine. Father did not tell Mother anything about school or trips to the doctor, nor did Mother. Father's sole basis for an award of sole custody to him (with two hours per month supervised visitation for Mother) was that he believes Mother engaged in parental alienation. He arrived at that conclusion based on Dr. Nolen's report and Mother's "refusal to take a polygraph." He admitted Mother had been the primary custodian and had no other complaints about Mother's parenting.

21

Dr. Scott was asked, "This case has been presented as either/or, of either coaching or abuse, and that's not all the possibilities, is it?" Dr. Scott replied "no" and explained that a child could change his/her story when being repeatedly asked the same questions in an attempt to keep the peace. A third alternative exists to Mother coaching the child when all of the allegations of coaching are disregarded.

As noted in the beginning, the GAL addressed the new allegations being raised at trial and asked that the child be interviewed again by Dr. Ann Duncan-Hively, the purported expert in parental alienation. Mother testified that the new allegations, since January 26, 2011, are that the child said Father "still plays bad games. She says that they hurt. She says that sometimes he touches her with his tongue, sometimes he touches her with his hand, sometimes he touches her with this part. She's not – she's just showing me, she's pointing." There was no interview by Dr. Ann Duncan-Hively. Despite the overwhelming probative evidence contrary to the proposition that Mother coached the child into making allegations that she had been sexually abused by her father, the judgment awarded Father sole legal custody. I believe the judgment is against the weight of the evidence and should not stand.[12] I would reverse the judgment.


Nancy Steffen Rahmeyer, P.J. – Dissenting Opinion Author

---

[12] At a minimum, the child should be seeing a therapist to resolve the issues raised. Father testified he would not take the child to a therapist.